# EXHIBIT ONE

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. NO. 04-30197-MAP

MELISSA OSTRANDER
Plaintiff

v.

HUSSMANN CORPORATION
Defendant

DEPOSITION OF: MELISSA OSTRANDER, taken before Micheline I. Bourbonnais, Certified Shorthand Reporter, pursuant to the Federal Rules of Civil Procedure, at the offices of [illegible] & ASSOCIATES, INC., 359 Main Street, [illegible] Floor, Springfield, Massachusetts, at [illegible] a.m. on August 24, 2005.

APPEARANCES:

SEE PAGE 2.

Micheline I. Bourbonnais
Certified Shorthand Reporter

APPEARANCES:

LAW OFFICE OF HAL ETKIN, 14 Hubbard Avenue, 2nd Floor, Springfield, Massachusetts 01105, representing the Plaintiff.
BY: HAL ETKIN, ESQUIRE

LAW OFFICES OF STEPHEN W. SILVERMAN, 73 State Street, Suite 203, Springfield, Massachusetts 01103, representing the Plaintiff.
BY: STEPHEN W. SILVERMAN, ESQUIRE

LAW OFFICE OF MICHAEL J. CHERNICK, 73 State Street, Springfield, Massachusetts 01103, representing the Plaintiff.
BY: MICHAEL J. CHERNICK, ESQUIRE

ROSS & ROSS, P.C., 121 State Street, Springfield, Massachusetts 01103, representing the Defendant.
BY: JOHN B. STEWART, ESQUIRE

IN ATTENDANCE:

LAURIE OSTRANDER

INDEX

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| MELISSA OSTRANDER | 5* | | | |

Stewart*
Etkin**
Silverman***
Chernick****

| EXHIBITS: | DESCRIPTION | PAGE |
|---|---|---|
| D Exhibit # 1 | Plaintiff's Answers to Interrogatories | 55 |
| D Exhibit # 2 | Diagram | 55 |

STIPULATIONS

It is agreed by and between the parties that all objections, except objections as to the form of the question, are reserved to be raised at the time of trial for the first time.

It is further agreed by and between the parties that all motions to strike unresponsive answers are also reserved to be raised at the time of trial for the first time.

It is further agreed that the deponent will read and sign the deposition under the pains and penalties of perjury, notary waived, and that the sealing of the said deposition will be waived.

It is further agreed by and between the parties that notification to all parties of the receipt of the original deposition transcript is also hereby waived.

* * * * *

about, what he asked you and what you told him?

A. The standard stuff when you get hired.

Q. What was the job as he described it to you as you understood it when you were getting hired?

A. Ringing up customers, taking care of the deli needs, slicing meats and cheeses, and stocking food, basic, you know, store, take care of needs, things like that.

Q. Did you know when you got hired there that you might on occasion be asked to grind hamburger?

A. When I first got hired, when we did a tour of the store he showed me the hamburger machine, so, I guess the answer is yes.

Q. So, you didn't know about that until you actually started?

A. Yes.

Q. As a part of your job as it evolved during the year you were there, did

you work in any other machinery?

A. No.

Q. Was there any kind of slicer there at all?

A. At Pleasant Street Market?

Q. Yes.

A. Yes.

Q. Did you ever do work on that?

A. Yes, I did.

Q. So, there's like deli meat kind of thing?

A. Yes.

Q. Do you remember what the brand or the name on the side of the slicer was?

A. No, I do not.

Q. Okay. Other than the slicer and the meat grinder, were there any other machines there that you worked on?

A. There was a machine where you would take a hamburger pattie, not really -- I don't know what you would call it, just like a slice of a meat and then you stick it through a machine where it pokes holes

through the meat kind of like.

Q. Was it a tenderizer?

A. It wasn't a tenderizer, I think it was like a cubed steak or something like that where it pounds it and make it more tender. Maybe it was a tenderizer. I only used that machine once.

Q. So, this was basically you put a piece of meat there and then you pull on a handle and it --

A. It went you would stick the meat through this hole and it -- I don't remember exactly how, I remember sticking it in the hole and it would just come out.

Q. Okay.

A. I don't know if it was a hand ground or I don't really remember.

Q. You only used it once and you don't remember a lot?

A. Yes.

Q. When you were at Pleasant Street Market, do you remember reading or having available to you operator's manuals for any

of these machines we're talking about?

A. If they were available to us, I don't remember seeing any of them. I'm sure they're probably put away like in the filing cabinets, what not.

Q. That was probably not a very good question because I kind of asked two things. I guess what I meant to ask was did you ever see one, did you ever see an operator's manual?

A. No, I didn't.

Q. So, let me just try to be clear, you didn't see manuals for slicers, or meat grinders or this other tenderizer cube steak machine?

A. No.

Q. Okay. So, your first day at work I guess Mr. Barry took you around and told you some things you were going to need to know?

A. Yes.

Q. Did he give you any -- let me strike that and start again.

Do you remember how that went, that particular time that he took you around?

A. It's a very small store.

Q. Yes.

A. So, really you have the grocery aisles, like two grocery aisles, you have the cigarette carton area, there's the cashier, you know, a stand where there is the lottery machines, stuff like that, and then you have the deli. So, he was pointing out the areas and stuff like that, nothing, no details of what needed to be done in the areas, I was going to be trained to do that.

Q. Okay. So, I gather he showed you how to use the cash register?

A. I had to stand by Kerry and watched her use the cash register and kind of get an idea of how to do that.

Q. Is there anything Mr. Barry personally showed you how to do when he was there?

A. No.

Q. Is it fair to say he left some of

these details of training to other people that were more experienced working at the store?

A. Yes.

Q. Okay. So, do you remember who it was that taught you about using the slicer?

A. I don't remember who taught me how to use the slicer.

Q. Okay. Do you remember whoever it was what they told you about it?

A. Basically put whatever you're slicing in the area and you catch, you use your right hand to move the thing back and forth and you catch whatever you're slicing in your hand and just put it down. And then there is a nozzle thing where you turn for however thickness you want it, and stuff like that.

Q. So, I guess the action of the machine with your right hand up with the slab of meat is kind of back and forth?

A. Yes.

Q. Close to your body, away from your

body?

A. Yes.

Q. Okay. And then you have your catching hand underneath the slicing area?

A. Yes.

Q. Okay. So, about how close is your catching hand going to be to the slicing blade?

A. It was very close.

Q. How is that?

A. Very close.

Q. Can you tell me in some distance measurement, inches or --

A. Two to three inches close it was, yes.

Q. Within a couple of inches?

A. Yes, a couple of inches.

Q. And did anybody tell you -- strike that.

Did anybody give you anymore details other than what we've already talked about here about the use of that machine and precautions and things like that?

A. They showed me how to clean the machine when it was closing time.

Q. Was there anything in writing about how to use that machine and how to work with that machine?

A. No.

Q. Do you remember receiving any instructions on the use of this meat tenderizer machine?

A. No.

Q. Do you remember receiving any instructions on the use of the meat grinding machine?

A. No.

Q. Did anybody demonstrate how this meat grinding machine was to be used?

A. What happened was when I first started there I'd get a quart of milk and stuff like that, when somebody was in there grinding hamburger meat I'd watch them, when I first started I'd watch what they were doing. I was never taught specific instructions. Actually, the first couple of


months when I was working there I did use it wrongly, I didn't know you had to ground the hamburger meat twice before you sell it.

Q. Yes.

A. So I was selling them like the already ground hamburger meat that wasn't run through, which is not a problem, it's not as lean. So then somebody told me, no, you've got to run it and then sell it.

Q. So, there may have been a couple of people that didn't get their meat ground twice through?

A. Yes.

Q. All right. Do you remember who it was that brought it to your attention that, look it, you really want to run it through there twice?

A. I don't remember exactly.

Q. Did you work a certain shift or certain days?

A. I've always worked right after school until maybe closing time, if not earlier, or on the weekend during the day,

or even sometimes at night.

Q. Okay. So, it wasn't always --

A. It wasn't specific hours, it wasn't the same, yes.

Q. So, some weekends you would work during the day, some weekends you'd work at night, it varied kind of thing?

A. Yes.

Q. So, the people that were actually working at the same time you were working, did that vary as well?

A. Yes. Well, no, I'm sorry. There was a couple of people who had, you know, their scheduled shifts, a lot of them were morning people, the ones that worked in the morning, and I'd come in to relieve them.

Q. Who were the people that you worked with more often than the other people?

A. Do you want names?

Q. Yes, please.

A. Okay. My friend Cheri -- do you want full names?

Q. Yes.

A. Cheri, C-h-e-r-i, Barbosa, Cecelia Fernandez, Kerry Friend, and then Cathy, I don't remember her last name.

Q. Cathy?

A. Yes, Cathy. Amber Parks.

Q. Are there other people that you worked with on a more infrequent occasional type basis?

A. Yes, the morning people, Agnes, I don't know her last name. Sue I very rarely worked with her.

Q. Okay.

A. Irene.

Q. Irene Ring?

A. Yes. I worked, I kind of worked with her a lot, I forgot about her.

Q. Okay.

A. There is another lady, I forgot her name.

Q. Okay. Was there a manager that you ever worked with?

A. Bill would always come in between

hours of, I want to say 10:00, maybe 9:00 in the morning and stay between 1:00 and 2:00, so at night when I'd come in I wouldn't see a manager.

Q. Did you ever know a fellow named Peter?

A. Yes, he started right after, a little before or after I left. So I want to say maybe he started in January maybe.

Q. Okay.

A. Of 2002.

Q. Did he ever have instructions for you about how to do your job?

A. No, he was training to be a manager while, during that time.

Q. When Bill was there, Mr. Barry?

A. Yes.

Q. Did he ever have suggestions on how to do things with your job?

A. Yes.

Q. Do you remember him ever observing you when you were using the hamburger grinder?

41

A. No.

Q. Did he ever have any instructions or comments for you about the use of the hamburger grinder?

A. No.

Q. A little bit before you were saying you got some information on how to use the hamburger grinder by watching other people use it, is that accurate?

A. Yes.

Q. Do you remember who you might have seen using it before you actually used it yourself?

A. A lot of people, I guess, Kerry, I shadowed her for a while so I followed her around when I was training, so, not Cheri, Kerry.

Q. Did any of these other people that you worked with other than Mr. Barry we already talked about, observe you using the hamburger machine before the accident?

A. People would always walk in and out of the cooler, so, obviously they would

42

see me doing it but they never gave me an opinion or, you know, reinstruct me how to use it.

Q. That was my question. So, is it fair to say none of the people that you worked with at the Pleasant Street Market ever had any critique or any comments about you using the hamburger grinder before the accident?

A. No, like -- I'm sorry, can you repeat that?

Q. Yes. Did anybody that worked at the Pleasant Street Market tell you what to do as far as you're doing this right, you're doing that wrong on the hamburger grinder?

A. No. They never said anything like that

Q. No comments either way?

A. Yes, exactly.

Q. Now, when you saw people using the hamburger grinder before you used it yourself, did you see them using that piece of wood called a stomper?

43

A. No.

Q. Did you ever see the stomper in the general area of the hamburger grinding machine before the accident?

A. It was always there. Sometimes, you know, it would be sitting in the sink, but most of the time it was always there.

Q. When you cleaned the machine, did you also clean the stomper?

A. Not always.

Q. Okay.

A. Sometimes.

Q. So, there were times that you had to clean it because it was dirty?

A. Yes.

Q. And those times when it was dirty, did that indicate to you that it was being used?

A. I cleaned it for sanitary purposes, I mean, it's hamburger meat, you know, a lot of bacteria just sitting in it. I think we just cleaned it, I mean, obviously it was used sometimes but like

44

very rarely.

Q. Did you ever see Mr. Barry using that hamburger grinding machine before the accident?

A. I never seen Mr. Barry on the hamburger machine unless sometimes he would pick up groceries to bring home and he would be in there, you know, probably doing hamburger meat, I would never see him on it.

Q. Okay. So, is it fair to say you never saw Mr. Barry using that machine?

A. Yes.

Q. Okay. Did you ever have any discussion with anybody at the Pleasant Street Market employee-wise about that stomper what it's used for?

A. Probably when I first started, just that they explained that it is used to push down the meat. But when I was following around or watching people use it I very rarely saw anybody really use it. The only time that I really seen people use it was when they had like the big chunk of meat

to go through and they would stick like maybe three, four pieces in the hole, long thin strips of meat, not like hamburger patties, they'd push it down like that. Other than that we rarely used it to grind the hamburger meat to go through again.

Q. Okay. So I make sure I understand this.

A. Okay.

Q. During the second grind, in other words, grinding hamburger it goes through once and then now you're going to put it through again?

A. To sell it.

Q. Was the stomper used for that second pass?

A. No.

Q. Okay. Did anybody ever tell you when the stomper was to be used and wasn't to be used?

A. I don't really remember.

Q. Okay. During the first time that somebody was instructing you about this meat



grinding machine, did they mention anything about the stomper?

A. I don't know, I don't remember. I'm sorry.

Q. Okay. Do you remember if the stomper was present and within your field of vision when you were first instructed about the use of the meat grinding machine?

A. Yes. It sits on like a rack where we slide drinks, like Snapple or whatever, I don't know exactly what kind of drinks it was, but on that rack.

Q. What distance is that away from the actual machine?

A. About a foot.

Q. Okay.

A. But in eye view.

Q. Are there any nonattached parts of the meat grinding machine other than that stomper that were in your field of vision?

A. Can you rephrase that?

Q. Yes. Was the stomper the only thing that wasn't attached to the machine?



A. No. There's a tray that collected all the hamburger meat that was grounded and it sits underneath where the holes where the hamburger, ground hamburger meat comes down. That's where like all the meat that is made during the day, and then we take that meat to grind through again to sell it.

Q. Let me just understand that. When you clean the machine you take it all apart, right?

A. No. That would be very difficult. No, we take the tray that sits on top of the machine, and the tray that has all the hamburger meat that's already been grounded through, we take that tray, and that's about it, I think we just clean those two parts.

Q. Is the inside of the machine ever cleaned out?

A. I'm sure it is. I've never seen it done personally.

Q. Okay. So, that wasn't part of what you were doing there?

A. No.



Q. And I understand this machine was in some kind of large walk-in freezer unit, or refrigerator unit?

A. Yes.

Q. Can you describe about how big a room that was?

A. Oh, maybe fifteen feet, that seems kind of long, twelve to fifteen feet to like by maybe six to nine feet, I mean, it was very not that big.

Q. Could I trouble you to do a diagram depicting that refrigerator unit, and then if you could, you know, depict the door where you walk in and then, you know --

A. This is the door we walked in.

(Witness drawing a diagram.)

Q. Okay.

A. So we'll say that's the door, and this is the wall, and we'll say these are the doors where the customers open up -- I'm a bad speller.

Q. Generally where is the counter in relation to all this?

keep dressing my hand up and like do stuff like that. She had like electrodes, or something like that, she attached to my area, it was just little shocks and stimulate the muscles and stuff.

Q. About how often would you go?

A. For the first, I believe first two or three months I went almost every day, then it started becoming every other day, and then every week, and then every other week, it was very often.

Q. So, by the end of that eight months were you coming about once a month, every couple of weeks?

A. Once a month, yes. Maybe every other month.

Q. And you had physical therapy at Shriners, according to my notes?

A. Yes.

Q. And that started about eight months after the accident, was this after you were done at Apex?

A. Yes.

Q. Okay.

A. I started some physical therapy at Apex, there is a machine I have to --

Q. What kind of physical therapy, or what did it involve at the Shriners?

A. Learning to adapt to doing daily things with my hand as it is.

Q. And what kind of activities or things did you do?

A. We basically did like cooking, we did a lot of cooking things like holding a bowl and mixing -- what else did we do -- we did like we tried to do hair, putting my hair up, trying to put necklaces on, standard stuff like that.

Q. Okay.

A. Your daily life needs, I guess, you have to do.

Q. So that was about three months at Shriners?

A. Yes, I was there for three months, maybe a little longer.

Q. Was there longer that you could

have gone, or was that where you had done all that you could do there?

A. Well, I could have been there longer, but what happened was I got the claw device, the prosthetic, we started working with that to adapt to it, and I really didn't want to use it. So then my nurse found another doctor in Boston, we went directly to him and stopped Shriners.

Q. Now, this myoelectric hand, that took a while to make, I gather?

A. Yes.

Q. Would you have to go to Boston and have fittings and they would work on it more?

A. Yes.

Q. Okay. Now, another one of the doctors involved after your accident was Doctor Leveton?

A. Yes.

Q. How did you come to start seeing her?

A. Cindy Bourbeau found her.

Q. This is the nurse that was provided by the workers' comp?

A. Yes.

Q. I gather she recommended that or put it together?

A. Yes.

Q. Do you remember about when the first time you saw Doctor Leveton was?

A. It was probably right when I was started receiving like the prosthetic devices and stuff like that, probably like eight months to a year after my accident.

Q. Now, before this accident happened you were planning on attending Johnson and Wales culinary arts program that September, that fall?

A. Yes.

Q. Okay. Now, when the accident happened, that was put on hold, is that accurate?

A. Yes.

Q. Did you have any communication with the school about holding your spot open

be your grandmother's?
A. Yes.
Q. Very close to your parents?
A. Yes.
Q. When was that?
A. That was when -- that was September of '04 till July of '05.
Q. I see. And what was the address of that?
A. That was 50 Pipit Drive.
Q. And about how close is that to your folks' house?
A. It's about twenty minutes.
Q. Twenty minutes?
A. Yes.
Q. Okay. I understand there has been a lot of movement but have we left anything out, have there been other places that you've lived away from your folks other than what we talked about?
A. I stayed at a friend's house for a week.
Q. And that was August - September of

'02?
A. Yes. Well --
Q. Or is that different?
A. That was different.
Q. Okay.
A. That was with my other friend. She had her own apartment and I moved in with her. But the summer of 2003 I moved, I was living with a friend for like about a week, a week and a half?
Q. Okay. So, were you seeing your boyfriend Jared at the time of this accident, or did you meet him later on?
A. I met him after my accident.
Q. About when did you meet him?
A. I met him probably a couple days after I came home from the hospital, he lived right across the street.
Q. Was he ever in the military?
A. Yes.
Q. Okay. Do you remember when he was in the service?
A. I believe he joined in November of

2002, I believe.
Q. Okay. And I gather he was away from the area for a while?
A. Yes.
Q. When did he come back?
A. He came back around Christmastime for a couple of weeks, and then he went back until June of 2003.
Q. So, June of '03 he came back to stay?
A. Yes. He was in the Reserves.
Q. Okay.
A. It might have been around November, December when he joined, I'm not quite exactly sure.
Q. Was there a time that you went on a flight to Chicago to visit him?
A. I went to Missouri to visit him.
Q. Missouri.
A. Chicago, there was a layover in Chicago.
Q. So, he was stationed out in Missouri?

A. Yes, he was.
Q. Was there ever a time you went to the state of Washington?
A. No.
Q. Okay. So, as of today, you're living at your folks' house, Grove Avenue in Westfield, with your son?
A. Yes.
Q. And your brother and sister live there?
A. Yes.
Q. And your parents?
A. Yes.
Q. Anybody else live there?
A. No.
Q. Okay. So, I gather you and Jared are separated at this point?
A. Yes.
Q. Are you employed as of today?
A. Yes, I am.
Q. Where do you work?
A. Big Y.
Q. Which one?

A. It's East Main Street in the Westfield Shops.
Q. Okay. How long have you worked at Big Y?
A. Yesterday was my second day.
Q. Okay. What do you do there?
A. They are going to start me as a cashier.
Q. Have you had some training there they went through?
A. The only yesterday training I got was bagging groceries, we haven't started training on the cash registers yet.
Q. Okay. So, the idea is you're going to become a cashier?
A. Yes.
Q. When did you apply for work there?
A. About a month and a half ago.
Q. Did you apply anywhere else at that time?
A. No, I did not.
Q. What caused you to apply a month and a half ago, if anything?

A. I guess just to like have my own money to do something.
Q. Is that roughly about the time that you and Jared split?
A. Yes.
Q. Why did you apply at Big Y as opposed to some other place?
A. My sister works there.
Q. I see. Okay. What was your last employment before working at Big Y?
A. I was a paraprofessional at Westfield North Middle School for two weeks, no two months.
Q. What did you do in that job?
A. I helped kids with their homework, class work, stay organized.
Q. Why did you leave that employment?
A. It was just like a subbing job, my mom asked me, because she works for the Middle School and she asked me because she needed help so I helped.
Q. About when was that?
A. That was April of 2004 till June

of 2004.
Q. Before April of '04 when you started, what was your, going backwards, employment before that?
A. I worked at a gas station for two months.
Q. Okay. Where was that?
A. I believe it was Texaco gas station, it was in Westfield, either Texaco or Citgo.
Q. Where is it?
A. In Westfield.
Q. On Route 20 or where?
A. Oh, Route 10, I believe -- Route 10-202. I worked there for like a month and a half.
Q. Okay. What did you do there?
A. I was a cashier, stocking things.
Q. So, you dealt with credit cards and pulling cigarettes off the rack and things like that?
A. Uh-huh.
Q. Okay. Do you remember who your

boss was there?
A. Yes.
Q. Who you reported to?
A. Her name was Koral, K-o-r-a-l. I don't know what her last name is.
Q. Okay. Is this close to downtown?
A. No, it's like five minutes from my parents' house, it's right by the Mass. Pike by exit four -- exit three, I'm sorry.
Q. Right. What was your employment going further back in time from the gas station, what was your next job?
A. Cracker Barrel.
Q. What did you do there?
A. I was a waitress.
Q. And this was the one by the Holyoke Mall?
A. Yes, it is.
Q. About how long were you there?
A. About two months.
Q. Okay. Why did you stop that employment?
A. I was having a hard time in my

life at that time, I was going through a lot of emotional issues, and they wanted me to have counseling through them, and I was like, no, you don't need to know my personal life. I wasn't making a lot of money, I wasn't being able to pay for my bills.

Q. What general time frame were you working at Cracker Barrel, is this before your son?

A. Yes.

Q. Was this during the time you were pregnant or before that?

A. No, I was pregnant at the gas station.

Q. Okay. Do you remember generally what kind of personal difficulties you were having when you were at Cracker Barrel?

A. Cracker Barrel, my personal problems, I had hit rock bottom, I didn't know who I was anymore, I was going like -- I took out my emotional problems on drinking, I really -- I don't know, I didn't know who I was, I didn't know what I wanted

out of life anymore, I was -- it was hard. There is a lot more but -- generally.

Q. Do you remember what year or what time period you were in Cracker Barrel?

A. June 2003 maybe, to maybe August 2003, I mean, it wasn't very long.

Q. Was this after STCC your second semester?

A. Yes.

Q. Do you remember what employment you had before Cracker Barrel?

A. On the Border.

Q. Okay. And that's the Mexican place on Riverdale?

A. Yes, it is.

Q. Okay. What did you do there?

A. I was a hostess.

Q. Okay. Did you like that work?

A. No, not really. I really wanted to be a waitress, I feel if I'm going to work in a restaurant I want to be a waitress, not a hostess, I want to deal with food and stuff like that. And start as a

hostess, move forward to being a waitress, and after like eight months I asked to become a waitress and they said to me that, well, you're going to have to take a test to become a waitress, all these stupid excuses, they kept coming up with excuses, and I was just, well, I'll find somewhere else to become a waitress.

Q. So, I gather being a waitress you get tips and that's a better job than being a hostess, is that right?

A. Yes.

Q. When you were a waitress later on at the Cracker Barrel did you have any physical difficulties doing the requirements of that job?

A. Yes.

Q. What kind of things were difficult?

A. They didn't have a tray stand like the food that you have to carry out had to be held in your hand, on a very hot tray, I had a hard time doing that. You're not

supposed to put the tray down on the table, you're supposed to hold it and put the food on the table. I didn't listen to that, I did put the tray on the table, it was hard for me, and I think they understood but -- I always used to spill things.

Q. Okay.

A. Something different that I didn't experience.

Q. On the Border did they use tray stands?

A. Yes, they did.

Q. Do you feel you could have done that job?

A. Yes.

Q. Where did you work before On the Border?

A. That was it.

Q. That was it?

A. Since my accident.

Q. That's okay.

Let me check something very quick.

There was a notation in one of the records

about doing some dancing somewhere. First of all, what time period was that, was that before On the Border, or you know --
A. It was after Cracker Barrel.
Q. After Cracker Barrel?
A. Somewhat during and after. I did it a couple of times.
Q. So, this would have been sometime after August of '03?
A. (Nod.)
Q. Is that accurate?
A. Yes. I'm sorry.
Q. Where did you do dancing?
A. At 418.
Q. And there was a friend of yours that was doing that?
A. (Nod.)
Q. Who was your friend?
A. Cheri Barbosa.
Q. All right. And this was a short period of time?
A. We kind of got involved together and we were both having problems in our life

and we, yes.
Q. Okay. Now, since the accident in April of '02, have you gone on any long trips other than this trip to Chicago and Missouri?
A. No.
Q. Have you gone on any vacations out of state?
A. I went to New Hampshire or New Jersey, I don't remember which one it was.
Q. Okay. How did you get there?
A. I drove.
Q. Was that to visit friends?
A. Yes.
Q. Who did you see?
A. A friend that I met, he's in the Army, he's stationed out there, so it was a day trip.
Q. A day trip?
A. Yes.
Q. Have you gone to the beach at all since your accident?
A. Yes.

Q. When was that?
A. Oh man -- I don't remember.
Q. Did that make you feel uncomfortable at all?
A. Yes.
Q. Do you remember where you went or who you went with?
A. We went to Hampton Beach, I went with my friend Cheri, Jared and Donny.
Q. With your new job at Big Y, is that going to be a full-time job?
A. Part-time.
Q. About how many hours are you wanting to work?
A. Between twenty, twenty-five.
Q. Okay. And who watches your son when you're working?
A. Mainly my mom, sometimes Jared will watch him.
Q. Do you have a cell phone?
A. No, I do not.
Q. Have you ever had a cell phone?
A. Yes, I have.

Q. Did you have a cell phone at the time of this accident?
A. Yes, I did.
Q. When is the last time you had a cell phone?
A. July or August of 2004.
Q. Okay. Now, as a result of this accident, have you gotten any prescriptions for medications, do you know what I mean, like pills that you go down to the drugstore and get?
A. I have maybe for like antibiotics if I had like stuff like that, but nothing like what I was on when I lost my hand.
Q. Nothing like --
A. The medication that I was on when I lost my hand.
Q. Okay. So, in the hospital there were pain medications?
A. Yes.
Q. Did Doctor Martin prescribe any prescriptions for you, any medications?
A. I was on antibiotics -- not

2002?

A. I went, I started going after my accident.

Q. Where did you start going?

A. My grandmother's church, I don't remember exactly what the name it's called, but I did go to my grandmother's church.

Q. Where is it?

A. In Enfield, Connecticut.

Q. Do you know what it's near?

A. No. Route 5 maybe.

Q. Okay. Did you go with your grandmother?

A. No, I met her there.

Q. Okay.

A. I went with her once and got to know where it was and then I just kept meeting her there.

Q. Okay. So, do you remember who was working at the time of your accident?

A. Yes.

Q. Who was there?

A. Cheri Barbosa and Irene Ring.

Q. And what time were you supposed to work to that day?

A. I'm not quite -- I don't remember.

Q. Were you towards the end of your shift, or I don't want you to guess but --

A. I think I was.

Q. Okay. At some point did some customer come in and order hamburger?

A. Yes.

Q. Was it a customer you knew at all or anybody you recognized?

A. I've seen her in there before, yes.

Q. You don't know her name?

A. No.

Q. What happened after the order was placed?

A. I went into the cooler and she asked for a pound of hamburger meat, and I took the meat from the tray and put it in the hole.

Q. Okay.

A. The reaction just to put it in, I

was pushing it down a little bit, not like, you know, the next thing I know my hand is in the meat grinder. So I turned it off. I kicked the door open twice and Irene came in and she turned the machine back on, I don't know why, but she did. I turned it off, and then the paramedics came.

MR. SILVERMAN: Do you want to take a break?

THE WITNESS: Yes.

MR. STEWART: Let's go off the record.

(A recess was taken.)

Q. (BY MR. STEWART) Ma'am, I will just go ahead and ask some more detail about what you just told us about. When the accident happened, was is the first run through with the meat, or was this the second pass?

A. It was the second pass.

Q. The second pass. Okay. So, Ms. Barbosa was working that evening or afternoon?

A. Yes.

Q. Do you know where she was?

A. She was ringing on the register.

Q. Okay. And do you know where Ms. Barbosa was -- I'm sorry -- Ms. Barbosa was there or no?

A. Yes, she was on the cash register.

Q. And where was Ms. Ring, if you know?

A. She was in the deli working, doing something in the deli. She was over here, I believe, working on making a salad, she was -- I don't quite remember what she was exactly doing.

Q. If we look at this diagram as it's laid out, this would be somewhat off to the left of the diagram where she was, over here somewhere?

A. Over here, yes, she was right by the door.

Q. Okay.

A. When I kicked it open she was right there.

Q. She was by the door to the walk-in cooler?
A. Yes.
Q. Okay. Had you ever had any difficulty with the running of that grinder before this accident?
A. No.
Q. Had you ever had an experience where anything got stuck in it?
A. The first round, the first processed meat we put through always would get jammed up a little bit, you just pushed it a little bit down and it would go right through, I mean --
Q. And when you're talking about pushing it through, how would you go about doing that?
A. I just with my hand.
Q. So, this kind of tapping it downward with your fingers?
A. Yes.
Q. Okay.
A. Just to push it along.

Q. And when you would be doing that, about how close would you be coming to the stainless steel pan on top?
A. Well, the hole is right in the stainless steel top, so, you would have to go down the hole a little bit to push it in.
Q. So, your fingers would actually be facing downwards somewhat?
A. Yes.
Q. And you would be actually touching the top of the meat with your fingertips?
A. Yes.
Q. Now, the meat that was -- this was the second pass when this happened?
A. Yes.
Q. Okay. And you say you thought it was about a pound of hamburger that got ordered?
A. Yes, a pound.
Q. Were you making more than that?
A. No.
Q. So, this was just made to order?
A. Yes.

Q. You weren't making any extra?
A. No.
Q. All right. Was the stomper on the shelf where it usually is at the time of all this?
A. I believe so, I don't remember exactly where it is. Usually it was always there.
Q. Did you use the stomper at all that evening before your accident?
A. No.
Q. Okay. So, you had run the meat through one pass, and then was it in the bottom of a bowl after the first pass, or where was it?
A. After the first pass it stays in the stainless steel --
Q. Kind of a pan?
A. -- pan thing.
Q. And then I gather you did something to get that meat back up to the top of the machine?
A. You grab the hamburger meat that's

been run through once with your right hand, or, no, because you hold like the container you're putting the hamburger meat in, so, I grabbed it with my left hand, put it in through again to grind it through the second time.
Q. Okay. And can you describe verbally, because we can't see on the record, so it has to be verbally, what you were actually doing with your left hand when all this happened?
A. I take the first ground meat, grab it with my left hand, I would push, you know, put it in the hole and push it down a little bit so that it would go through.
Q. The -- I don't know how to better describe it but the amount of meat or the -- was it kind of in a ball or was it stretched out, or what did it look like when you went to put it from underneath and back on top?
A. It's usually like in a big pile, it wasn't stretched out or anything, it

wasn't tightly in a ball, it was in a pile of --

Q. So, one pound pile of meat is how big in relation to the hole that's on top in the stainless steel pan, is it bigger than the hole?

A. Usually, yes, it was sticky so it would be, so like usually I'd grab a handful put that in and I grab a little bit more and put it in again.

Q. Okay. How is it, I know this is a difficult subject matter, and how is it that your hand ended up going down the hole?

A. I was tapping the meat, and I was watching it come through the other end and I was doing both looking back and forth and I just do that normally, I don't know what happened, why all of a sudden that just one time I got stuck, I don't quite really --

Q. At some point did you feel your hand being drawn in there?

A. Yes.

Q. Okay. Was there anything that you

could do at that point?

A. No.

Q. Was the meat pulling your hand at all?

A. Yes, it was.

Q. I gather at some point you had a chance to hit the off switch?

A. Yes.

Q. Okay. About how long after you realized there was a problem where you were able to hit the off switch?

A. Immediately, but I mean I definitely felt something was going wrong and I just turned it off.

Q. Okay. Were you trying to pull your hand out at the same time you were hitting the off switch?

A. No, I didn't want -- I felt pain and I didn't want to be in more pain. When my hand was in there I didn't know if I was stuck in the thing or not and I didn't want to try.

MR. STEWART: Let's take a

moment here.

(Pause.)

MR. STEWART: Are you okay?

THE WITNESS: Yes.

MR. STEWART: Okay.

Q. (BY MR. STEWART) When you felt something starting to go wrong, was it your instinct to try to pull your hand out?

A. I think I might have a little bit, it couldn't go anywhere.

Q. Did that -- were you able to -- was your trying to do that have any effect?

A. I might have done that like after I turned the machine off just to --

Q. Okay.

A. I remember looking at the underneath to see if there was a lot of blood coming out of, but I didn't know where I was in the machine or what had happened.

Q. Could you see how much of your hand was above the machine?

A. I believe it was like wrist area.

I don't remember exactly.

Q. So, did you call out or did you say anything?

A. I knew that it was a sound proof door, unless like somebody opens it up, like the customers open up the door to open, you know, to get something out of the cooler, so I knew I had to kick, somehow get that door opened, so, I just kicked it open with my left leg backward and opened it and, I don't know, I don't remember what I said, I think -- I don't remember, but I yelled out for Irene.

Q. What happened next?

A. Irene came in, she looked at what happened, she might have asked me what, you know, I don't remember exactly what she asked me, I remember her just turning the machine on and I remember saying oh God no, and I turned it off immediately, but when she ran out I think Cheri ran in.

Q. Based on your memory, about how long was the machine on after Irene turned

137

it on before --

A. Briefly, I mean, I saw her going for it and doing it, I don't know, and then I saw her turn it on, and I was like what are you doing, I turned it off and --

Q. When Irene turned the machine on, did you feel it move at all?

A. Yes.

Q. Was your hand drawn in anymore when she turned the machine on?

A. All I know is I felt more pain.

Q. Okay. At that point medical people were called?

A. Yes.

Q. About how soon was it till they got there?

A. I don't remember.

Q. From there you went to Noble, is that right?

A. No, Baystate.

Q. Baystate. Okay. And how long were you actually in the hospital before you came home?

138

A. I believe four or five days, I believe.

Q. Okay. And there was surgery with Doctor Wenner?

A. Yes.

Q. And then you were home for a while?

A. (Nod.)

Q. Then there was other surgery, is that right?

A. Yes. Mainly I'd go in for a wrap change, they'd have to put me under for a wrap change, but this one time they did remove extra like skin.

Q. So they actually had to give you anesthesia where they'd knock you out to do the wrap?

A. Yes.

Q. And about how many times did they have to knock you out to do that?

A. I think twice.

Q. Okay. Let me just follow-up -- that's all I'm going to ask you about the

139

actual accident, I'm going to ask you about a few other things.

Before the accident, did you feel that you were qualified to use the meat grinder?

A. Oh, yes.

Q. Before the accident did you consider the meat grinder to be defective in any way?

A. It always looked old and dirty. I never really thought about an emergency stop button but -- I don't know anything technical about a machine but just the fact that it did look old and dirty.

Q. Okay. Before the accident did you ever feel the machine was defective for the lack of an emergency stop button?

A. No, I mean --

Q. Before the accident did you even know what an emergency stop button was?

A. No.

Q. Okay. Before the accident did you consider any other features of the machine to make it unsafe?

140

A. I really never thought about it.

Q. Okay. Were you ever scared of using the machine before the accident?

A. No.

Q. Okay. Did you understand before the accident that the slicer and the meat grinding machine that you had to be careful?

A. Yes.

Q. Okay. Did Mr. Barry or anyone else at the Pleasant Street Market suggest to you before the accident things you had to be careful of regarding the use of these machines?

A. More of the slicer than the hamburger machine.

Q. Okay. Do you remember anything said about the things that were tricky about using the meat grinder?

A. Not suggestively, but we talked about like how the plunger thing meat sticks to it, I mean, it wasn't like, oh, hey, how do you feel about this, you know.

Q. So who was talking about the

plunger?

A. I don't remember.

Q. Okay. Before you used the meat grinder, up until the time of the accident, did you ever feel that you didn't have enough information to be able to use it safely?

A. No.

Q. Okay. Now, can you describe about how big the hole on the top of the machine in this stainless steel pan was?

A. About like the rim of the coffee cup. (Witness indicating.)

Q. Okay.

A. Is that a good description?

Q. Right. Before the accident did you ever look down in that hole and saw what was down there?

A. Yes, I -- yes.

Q. What did you understand was down there?

A. You could barely see down there, it was very dim in the thing, I always

looked down there, I could never see anything -- not always looked down but I did look down there.

Q. Did you understand that there was some moving parts down there that ground hamburger?

A. Yes.

Q. Okay. Before the accident did you understand that down that hole was something that was dangerous?

A. Oh, yes. Well, I didn't know if it was -- I still don't know if it's like sharp razors that are down there or if there is like a circular spiral thing down there of just metal, I don't know -- I knew there is something down there that spinned, basically.

Q. Before the accident you knew that there was a hole there and down that hole there was some moving parts?

A. Yes.

Q. And those moving parts were involved in taking a piece of meat and turn

it into a piece of hamburger?

A. Yes.

Q. And you knew if you dropped some object like a spoon down there that the spoon would get damaged, is that accurate?

A. Yes. Yes.

Q. Okay. And were you aware before the accident of the hazard of if you got your hand started down that hole?

A. Was I aware?

Q. There was a hazard presented if you got your hand started down that hole?

A. Well, yes, it is a hazard.

Q. And what was your understanding before the accident of what might happen if you got your hand caught in there?

A. I just knew it would be dangerous, I never really thought in depth how bad it would be, but like I mean when you nail a nail in the wall you can hit your thumb, I mean, you don't always think of small things like that, I never really thought the thought.

Q. Would it be fair to say this machine was self-feeding, in other words, if you started a piece of meat at the top it would go in there automatically?

A. No, I don't think it was self-feeding.

Q. Okay. So, if something was going to be put through the machine it was going to have to be presented right to the top and then have gravity feed it down?

A. Yes.

Q. Okay. So, if there was a piece of meat that was lying horizontally it wasn't going to go in, it actually had to be put in there vertically?

A. Yes.

Q. Have you ever filed for unemployment compensation since this accident?

A. Yes.

Q. When was that?

A. I received unemployment right immediately after my accident, I never filed

145

for it but --

Q. I'm not talking workers' compensation, I'm talking unemployment compensation.

A. Oh, no. No.

Q. Okay. Were you aware before the accident of a risk of injury if your hand went down in the hole at the top of the machine where the stainless steel tray was?

A. Was I aware that something could happen?

Q. Were you aware of the risk of an injury if your hand were to go down the hole?

A. All the way down, yes, but I never imagined like just poking the meat in would affect anything whatsoever.

Q. Did you know that if your hand were to go beyond the top of the hole that there was a risk of injury to your hand if your fingers were to go in there?

A. No, because I was looking, everybody would stick their hands past the

146

hole just to push the meat down, so that the thing down there could, I don't know, collect it.

Q. Okay. Did you know if your hand went down there that there could be an injury to your hand before the accident?

A. I mean, obviously, like everybody put their hand down there to push the meat, so, I mean, there was awareness of how far along you can put your hand in, not like you're just poking, yes, if you stuck your hand all the way down there for no apparent reason, yes, you're going to get stuck in the machine, but everybody put their hand in to push the meat, it was just -- you know, that's what people did, but, you know, to push the meat in.

Q. Based on your knowledge before this accident, what was the safe level where a person's fingers could go below the lip of the hole?

A. There was no like set level, nobody suggested you can put your hand

147

halfway through and nothing would happen, you're just tapping the meat in.

Q. I'm not trying to be smart.

A. I know. I know.

Q. I just want to see where your knowledge was.

A. I see what you're saying.

Q. Did you see people go down more than a certain level?

A. Well, normally like there would be only one person working the deli and, you know, whoever is working the deli they would be doing all that hamburger meat. At the time of my accident Irene was busy in the deli, I was ringing on the register and so somebody was asking for hamburger meat. Irene asked me to take care of the person, she was busy doing something, so, I went in the cooler to do that, so, normally like you're not just hanging around watching people like.

Q. Understood. What's the deepest you ever saw anybody push their hand down in

148

that hole before your accident?

A. I don't know. I've never sat there and watched somebody like stick their fingers down like, I mean, I've seen people like push the meat down with their hand but like I don't sit there and watch them stick their, you know, how far they've done it, you know.

Q. Did you ever see anybody push meat down lower than the rim of the stainless steel top of the meat grinder?

A. Yes.

Q. About how far below that, if you can remember and estimate?

A. I just know they push, I don't know -- I don't know exactly, I just know they're pushing with their fingers, I don't know how far down it is, but I know they're pushing with their hands and fingers.

Q. You knew at some point going down that hole, going down that cylinder, there were some moving parts that started to grind the hamburger meat, right?

Case 3:04-cv-30197-MAP Document 32-2 Filed 11/16/2005 Page 18 of 19

A. Yes.

Q. Is it fair to stay you didn't know how far down those moving parts started?

A. Yes, it is fair to say that, yes.

Q. Okay. Do you consider the training that you received at the Pleasant Street Market to have been sufficient to allow you to operate this machine safely?

A. I don't think it was that great. I was never really trained on the machine, I was never taught exactly how to do it like, so, I should say no, it wasn't sufficient at all, I mean, it could have been better, it could have been better training.

Q. Okay. Do you consider the training that you did receive to be adequate?

A. No.

Q. Okay. Before the accident were you aware that the hole on top of the machine where the hamburger meat went down was unguarded?

A. What do you mean, can you rephrase

that?

Q. Yes. Before the accident?

A. Yes.

Q. Dealing with the meat grinding machine, were you aware that the hole on top of the machine where the hamburger goes into were you aware that there was not a guard there?

A. There was never a guard there, yes, it was just a hole, yes, there was nothing there blocking the hole at all.

MR. STEWART: I think I will leave it there. These gentlemen may have some questions.

MR. ETKIN: No, thank you, John. No questions.

(The deposition concluded.)

*****

COMMONWEALTH OF MASSACHUSETTS
COUNTY OF HAMPDEN

I, Micheline I. Bourbonnais, a Notary Public within and for the Commonwealth of Massachusetts at large, do hereby certify that I took the deposition of MELISSA OSTRANDER, pursuant to the Federal Rules of Civil Procedure on August 24, 2005, at the offices of PHILBIN & ASSOCIATES, INC., 959 Main Street, 4th Floor, Springfield, Massachusetts.

I further certify that the above-named deponent was by me first duly sworn to testify to the truth the whole truth and nothing but the truth concerning her knowledge in the matter of the case of MELISSA OSTRANDER vs. HUSSMANN CORPORATION, now pending in the United States District Court for the District of Massachusetts.

I further certify that the within testimony was taken by me stenographically and reduced to typewritten form under my direction by means of COMPUTER ASSISTED TRANSCRIPTION; and, I further certify that said deposition is a true record of the testimony given by said witness.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of the action.

WITNESS my hand and seal this ______ day of September, 2005.

______________________
Micheline I. Bourbonnais
Notary Public
Certified Shorthand Reporter

My commission expires
October 31, 2008

SIGNATURE PAGE - ERRATA SHEET

(To be signed by deponent and returned to counsel within thirty (30) days.)

I, the undersigned, MELISSA OSTRANDER, do hereby certify that I have read the foregoing transcript of my testimony given in the matter of MELISSA OSTRANDER vs. HUSSMANN CORPORATION, on August 24, 2005, and that to the best of my knowledge, said transcript is true and accurate with the exception of the following corrections listed below:

Page : Line:
______________________
______________________
______________________
______________________
______________________
______________________
______________________
______________________
______________________

DEPONENT'S SIGNATURE: ______________

DATE ______________

mib